**ARMINAK & ASSOCIATES, INC., Plaintiff,**

v.

**SAINT–GOBAIN CALMAR, INC., Defendant.**

**No. SACV 04–1455CJCAJWX.**

United States District Court, C.D. California, Southern Division.

March 20, 2006.

Daniel C. Decarlo, Isamu H. Lee, Michael N. Radparvar, William C. Steffin, Lewis Brisbois Bisgaard & Smith, Los Angeles, CA, for Plaintiff.

Jeffrey K. Joyner, Larry W. McFarland, Keats McFarland & Wilson, Beverly Hills, CA, Keith Lee, M. Kelly Tillery, Nicole D. Galli, Pepper Hamilton, Philadelphia, PA, for Defendant.

## ORDER GRANTING PLAINTIFF AND COUNTERCLAIM–DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF NONINFRINGEMENT

CARNEY, District Judge.

This patent infringement case concerns two design patents for a device known as a "trigger sprayer shroud:" a plastic cover that fits over the pump mechanism used in plastic spray bottles. (Opposition Brief, p. 1.) Defendant Saint–Gobain Calmar, Inc. ("Calmar") asserts that Plaintiff and Counterclaim Defendant, Arminak and Associates ("Arminak") infringed its United States Patents Nos. Des. 381,581 (the " '581 Patent") and Des. 377,602 (the " '602 Patent") by selling a device known as the "AA Trigger." Arminak now moves for

partial summary judgment of Calmar's design patent infringement claim, on the ground that no reasonable jury could find that the AA Trigger infringes the '581 or '602 Patents. Because the Court finds that Calmar has failed to present evidence that an ordinary observer would be deceived by the overall visual similarities between the patented designs and the accused device, Arminak's motion is GRANTED.

## I. Background

Arminak has sold and distributed packaging systems for the cleaning, household and cosmetic industries since 1999. (Helga Arminak Decl., ¶ 3.) Its product mix includes, but is not limited to, bottles, spray pumps, and trigger sprayers. (*Id.;* UDF No. 4.) A trigger sprayer is the portion of a spray bottle that sits atop the container, and consists of a valve body, a trigger, a shroud or covering, a nozzle, a closure, a spring, a piston, two valves and a dip-tube. (Friedman Decl., ¶ 2.) Arminak sells trigger sprayers to manufacturers of cleaning supplies and household products, and also to "contract fillers:" companies that are hired by branded cleaning supply companies to fill containers with solution and affix trigger sprayers and labels to the finished product. (Supp. Helga Arminak Decl., ¶ 4; McKernan Depo., 90:22–91:4.) Both the manufacturers and the contract fillers purchase the trigger sprayers through "buyers," whose regular job is to source and purchase liquid dispensing system components. (Supp. Helga Arminak Decl., ¶ 4.) These buyers have varying levels of knowledge regarding the characteristics of trigger sprayers, depending on the size and sophistication of the companies that employ them. (McKernan Depo., 90:1–18, 72:9–73:10; Czuprynski Depo., 82:6–84:20, Exh. 22 to Lee Decl.)

Calmar manufacturers and sells trigger sprayers to brand holders of household, automotive, lawn, and garden products. (Mirocke Depo., 102:1–10, Exh. 6 to Lee Decl.) Its trigger sprayers are not sold directly to retail consumers or end users, but pass through a series of distributors before arriving on the store shelf as part of the packaging for Calmar's customers' products. (*Id.* at 210:17–21; McKernan Depo., 90:15–18.) Some of Calmar's customers are multi-national companies such as S.C. Johnson or Procter and Gamble, which have their own purchasing departments with knowledgeable in-house buyers. (UDF No. 11; DeCarlo Decl., Exh. T; Czuprynski Depo., 71:20–74:4, Exh. 22 to Lee Decl.) Others are smaller contract fillers and packaging distributors, which buy trigger sprayers through buyers who may be less discerning than buyers for large companies. (McKernan Depo., 90:1–18, 72:9–73:10; Czuprynski Depo., 82:6–84:20, Exh. 22 to Lee Decl.) The distributors either put the trigger sprayers on bottles filled with a liquid and re-sell them to retail stores, or sell them to other distributors who pass them down the stream of commerce until they are sold at retail stores to consumers. (Mirocke Depo., 210:17, 23–25; McKernan Depo., 90:15–18; Rodden Depo., 39:22–40:11.)

In 1995, Calmar invented the sprayer shroud designs that are the subject matter of the '581 and '602 Patents. Its patent applications were approved in 1997. Both patents claim only the plastic covering, or shroud, portion of a trigger sprayer, and do not claim the containers themselves. (UDF No. 5; DeCarlo Decl., Exhs. A and B.) Calmar subsequently produced a commercial embodiment of the '581 Patent, called the "ERGO shroud." No commercial embodiment of the '602 Patent has been produced.

In 2004, Arminak began offering for sale the accused device, a trigger sprayer known as the AA Trigger. (UDF No. 3; Armin Arminak Decl., ¶ 2.) Calmar soon became aware of the AA Trigger and, in October 2004, sent a letter to one of Arminak's customers stating, "Recently, representatives of Calmar purchased a product in the marketplace bearing a trigger sprayer that Calmar believes infringes [the '581 and '602 Patents], and which appears to originate from [you.]" (Calmar's Response to Arminak's UDF No. 6.) On November 16, 2004, Arminak sued Calmar for declaratory judgment of patent non-infringement. (Complaint). Arminak has since amended its Complaint to assert additional claims for declaratory relief of patent invalidity, federal and state law unfair competition, intentional interference with prospective economic advantage, and trade libel. (Second Amended Complaint, ¶¶ 24–53.) Calmar has counterclaimed for infringement of the '581 and '602 Patents. (Third Amended Counterclaims, ¶¶ 23–34.) Arminak now seeks partial summary judgment of Calmar's patent infringement counterclaims, on the ground that no genuine issue of material fact exists as to infringement.

## II. Summary Judgment on the Issue of Infringement

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In making a summary judgment determination, the Court must view the evidence presented in the light most favorable to the non-moving party, drawing "all justifiable inferences ... in his favor." *Id.* at 255, 106 S.Ct. 2505.

The moving party in a summary judgment motion bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes this initial showing, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citation omitted). Where the nonmoving party bears the burden of proof at trial on an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element in order to avoid summary judgment. *Id.* at 322, 106 S.Ct. 2548. To defeat a summary judgment motion, the opponent may not rely on the pleadings, but must affirmatively come forth with sufficient evidence to substantiate its claims or defenses. *Id.* at 324, 106 S.Ct. 2548. The evidence submitted by the non-moving party must be "believed, and all justifiable inferences are to be drawn in [its] favor." *KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1449–50, 27 U.S.P.Q.2d 1297 (Fed. Cir.1993). Thus, the Court must determine whether Arminak has met its initial burden of showing the absence of any genuine issue of material fact, and whether Calmar, the non-moving party and the party with the burden of proof at trial, has presented sufficient evidence to raise a genuine issue of material fact as to whether the AA Trigger infringes the '581 and '602 Patents.

## A. The Test for Infringement of a Design Patent

 "A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent." *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 36 U.S.P.Q.2d 1417 (Fed.Cir.1995) (*citing KeyStone*, 997 F.2d at 1450, 27 U.S.P.Q.2d at 1302). A design patent is infringed by the "unauthorized manufacture, use, or sale of the article embodying the patented design or any colorable imitation thereof." *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116–17 (Fed.Cir.1998). 35 U.S.C. Section 289 provides in relevant part:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

 The first step in determining whether a design patent has been infringed is to construe its claims to determine their meaning and scope. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 34 U.S.P.Q.2d 1321 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996); *OddzOn Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404, 43 U.S.P.Q.2d 1641 (Fed.Cir.1997) ("Whether a design patent is infringed is determined by first construing the claim to the design ..."). Claim construction is a question of law for the court. *Markman*, 52 F.3d at 979, 34 U.S.P.Q.2d at 1331 ("When, after considering the extrinsic evidence, the court finally arrives at an understanding of the language as used in the patent and prosecution history, the court must then pronounce as a matter of law the meaning of that language."). In construing patent claims, courts consider the patent's claims, the specification, and the prosecution history. *Id.* at 979, 34 U.S.P.Q.2d at 1329 (*citing Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561, 19 U.S.P.Q.2d 1500 (Fed.Cir.1991); *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396–98, 181 Ct.Cl. 55, 155 U.S.P.Q. 697, 701–03 (1967)). Courts may also consider "expert testimony, including evidence of how those skilled in the art would interpret the claims," as well as other extrinsic evidence. *Id.* (*citing Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631, 3 U.S.P.Q.2d 1109 (Fed. Cir.1987)). As design patents typically are claimed as shown in drawings, without any written description, the court's claim construction must be adapted accordingly. *Goodyear*, 162 F.3d at 1116 (citing 37 C.F.R. § 1.153(a)).

Once the court has construed the patent's claims, it must compare the accused item to the patented design for overall visual similarity, to determine whether infringement has occurred. *Elmer*, 67 F.3d at 1577, 36 U.S.P.Q.2d at 1420 (*citing Markman*, 52 F.3d at 976). The test for infringement has long been known as the "ordinary observer" test:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1871).

 Infringement of a design patent occurs if "the designs have the same general visual appearance, such that it is likely

that the purchaser would be deceived into confusing the design of the accused article with the patented design." *Goodyear*, 162 F.3d at 1118. Complete similarity is not required to find infringement, and "minor changes in a design are often readily made without changing its overall appearance." *Id.* at 1117. However, if the overall impression of the designs are dissimilar, infringement cannot be found based on similarity of specific features. *OddzOn*, 122 F.3d at 1405, 43 U.S.P.Q.2d at 1647. In applying the ordinary observer test, the court's analysis "is not limited to the ornamental features of a subset of the [design patent's] drawings, but instead must encompass the claimed ornamental features of all figures of a design patent." *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1379, 62 U.S.P.Q.2d 1065, 1069 (Fed.Cir.2002). The court must consider the features of the design that would be visible during normal and intended use throughout the article's entire lifetime, not only those features visible at the time of sale. *Id.* The period of consideration is that "beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of the article." *Id.* at 1379, (*citing In re Webb*, 916 F.2d 1553, 1557–58, 16 U.S.P.Q.2d 1433, 1436 (Fed.Cir.1990)).

■ Finally, the similarity between the accused device and the patented design must stem from the points of novelty that distinguish the patented invention from the prior art. *Bernhardt, L.L.C. v. Collezione Europa U.S.A., Inc.*, 386 F.3d 1371, 1383 (Fed.Cir.2004); *Contessa*, 282 F.3d at 1377, 62 U.S.P.Q.2d at 1067; *Goodyear*, 162 F.3d at 1113. This "point of novelty" test is distinct from the "ordinary observer" test, and it is legal error to merge them by, for example, taking the overall claimed design to be the point of novelty. *Bernhardt*, 386 F.3d at 1383 ("[I]n determining infringement, the 'point of novelty' test is distinct from the 'ordinary observer' test and requires proof that the accused design appropriates the novelty which distinguishes the patented design from the prior art."); *Contessa*, 282 F.3d at 1377, 62 U.S.P.Q.2d at 1067. "While it is the design as a whole that is patented … the distinctions from prior designs inform the court's understanding of the patent." *Goodyear*, 162 F.3d at 1118 (citation omitted). If the overall visual impression of the accused device and the patented design are dissimilar, and would not deceive the ordinary observer, there is no need to address the "point of novelty" test. *KeyStone*, 997 F.2d at 1451, 27 U.S.P.Q.2d at 1303 ("The only issue presented in [plaintiff's] motion for summary judgment was whether a genuine issue of material fact existed as to overall similarity. Because the court properly concluded that there was no such genuine issue, and both overall similarity and appropriation of the point of novelty are required for design patent infringement, the court did not need to address point of novelty.")

## B. Application

### 1. Claim Construction

The '581 and '602 Patents are each titled "Sprayer Shroud," and the claim of each patent is represented by five drawings showing different views of the shroud. (Exhs. A and B to DeCarlo Decl.) The drawings show, respectively, a side view (figure 1), front view (figure 2), top view (figure 3), back view (figure 4), and bottom view (figure 5). (Exhs. A and B to DeCarlo Decl.) Based on its review of the '581 and '602 Patents, the parties' proposed claim constructions, and examples of prior art submitted by the parties, the Court construes the Patents' claims as follows:

### a. The '581 Patent [1]

■ The trigger sprayer shroud design is as represented in the five drawings contained in the '581 Patent. It does not include the nozzle, trigger, or closure cap. Viewed from the side, the shroud has a horizontal top surface which ends in a perpendicular line at the frontmost portion and descends, approximately two-thirds of the way to the back of the shroud, in an obtuse angle into a downwardly sloping rear portion. The rear edge extends downward from the top portion at an approximately 135 degree angle, and then curves more vertically downward to intersect with the base of the shroud very slightly above the level of the closure cap. The bottom edge of the shroud extends horizontally backward from the nozzle for a short distance, and then extends downward at an obtuse angle towards the closure cap. Shortly before it intersects with the closure cap, the bottom edge becomes almost vertical. Approximately halfway up the vertical side surface of the shroud, a line extends from the base of the nozzle horizontally across the side of the shroud, and parallel to the top edge, to the rear edge. It is apparent, on a side view, that the surface of the shroud bulges outward

towards the viewer just below the horizontal line, and that the bulged surface extends to the bottom of the shroud.

Viewed from the front, the shroud's sides extend vertically downward until they are even with the base of the nozzle, and then bulge out in a curved and convex manner until they intersect with the closure cap. The back view is a mirror image of the front: the sides extend vertically down from the top edge, and then bulge outward in a curved and convex manner starting approximately halfway down the shroud, to intersect with the closure cap.

Viewed from above, the shroud has a rectangular top surface with sides approximately five times the length of the front and back edges. Behind the rectangular top surface, a downwardly-sloping back surface can be seen, of the same width as the top rectangular portion. The back surface slopes down to the rearmost edge of the shroud, which is rounded. Shortly before it intersects with the rearmost edge, the back portion widens significantly outward to intersect with the side edges. Below the top rectangular portion, wider sides can be seen extending down. The sides have approximately parallel edges

---

1. The '581 and '602 Patents' file histories indicate that the PTO examiner originally issued a provisional rejection of the application that resulted in the '581 Patent, based on the judicially created doctrine of obviousness type double patenting. (DeCarlo Decl. Exhs. H, I.) That doctrine is based on the public policy against prolonging a patent term by permitting claims in a second patent that are merely an obvious variation of claims in a prior patent. *In re Vogel,* 57 C.C.P.A. 920, 422 F.2d 438, 164 U.S.P.Q. 619, 621–23 (1970). *See also Sarkisian v. Winn–Proof Corp.,* 697 F.2d 1313, 1324–25, 217 U.S.P.Q. 702 (9th Cir. 1983). The obviousness type double patenting doctrine may be overcome, however, and the second patent may be issued, if the applicant files a terminal disclaimer in compliance with 37 C.F.R. 1.321(b). *Sarkisian,* 697 F.2d at 1326 (reversing the district court's finding

of invalidity due to obviousness type double patenting, because "the terminal disclaimer [filed by the second patent applicant] effectively disposed with the problem of the '482 patent's extending the monopoly of the '696 patent beyond the time period permitted by statute.") That provision allows an applicant to "disclaim or dedicate to the public the entire term, or any terminal part of the term, of a patent to be granted." 37 C.F.R. 1.321(b). Although the patent examiner originally found the '581 Patent's claim not to be patentably distinct from that of the '602 Patent, the examiner issued the '581 Patent after Calmar filed a terminal disclaimer. (DeCarlo Decl., Exhs. H, I.) Despite the fact that the examiner found the two designs not patentably distinct, the Court construes the patents' claims separately to reflect differences in the two designs.

that curve very slightly inward as they move towards the front of shroud, and curve more dramatically inward approximately two-thirds of the way to the front edge to converge with the sides of the rectangular top surface a short distance before the start of the nozzle.

Viewed from below, the shroud has a gently rounded rear edge and approximately parallel sides that curve very slightly inward until approximately two thirds of the way to the front edge, at which point they curve more dramatically inward to end a short distance before the start of the nozzle. The narrowed, parallel sides then extend straight forward for a short distance to intersect with the nozzle.

### b. The '602 Patent

The trigger sprayer shroud design is as represented in the five drawings contained in the '602 Patent. It does not include the nozzle, trigger, or closure cap. Viewed from the side, the shroud has a horizontal top surface which ends in a perpendicular line at the frontmost portion and descends, approximately two-thirds of the way to the back of the shroud, in an obtuse angle into a downwardly sloping rear portion. The rear edge extends downward from the top portion in a straight line, but curves more dramatically inward shortly before intersecting with the bottom edge of the shroud at slightly above the level of the closure cap. The bottom edge of the shroud extends horizontally backward from the nozzle for a short distance, and then extends downward at an obtuse angle towards the closure cap. Shortly before it intersects with the closure cap, the bottom edge becomes almost vertical. Approximately halfway up the vertical side surface of the shroud, a line extends from the base of the nozzle horizontally across the shroud, and parallel to the top edge, to the rear edge. It is apparent, on a side view, that the surface of the shroud bulges outward towards the viewer just below the horizontal line, and that the bulged surface extends to the bottom of the shroud.

Viewed from the front, the shroud's sides extend vertically downward until they are even with the base of the nozzle, and then bulge out in a curved and convex manner until they intersect with the closure cap. The back view is a mirror image of the front: the sides extend vertically down from the top edge, and then bulge outward in a curved and convex manner starting approximately halfway down the shroud, to intersect with the closure cap. The back of the shroud shows a change in elevation due to an outwardly-protruding bulge that begins approximately one third of the way up the convexly-curving portion of the shroud.

Viewed from above, the shroud has a roughly rectangular top surface with sides approximately five times the length of the front and back edges. The back edge of the top surface is rounded, which prevents the shape from being perfectly rectangular. Behind the roughly rectangular top surface, a downwardly-sloping back surface can be seen, of the same width as the top rectangular portion. The back surface slopes down to the rearmost edge of the shroud, which is rounded. Shortly before it intersects with the rearmost edge, the back portion widens significantly outward to intersect with the side edges. Below the top rectangular portion, wider sides can be seen. The sides have approximately parallel edges that curve very slightly inward as they move towards the front of shroud, and curve in more dramatically a short distance before the start of the nozzle. Viewed from below, the shroud has a gently rounded rear edge and approximately parallel sides that curve very slightly inward as they move towards the front of the shroud, and curve in more

dramatically a short distance before the start of the nozzle. The narrowed, parallel sides then extend straight forward for a short distance to intersect with the nozzle.

### 2. The Ordinary Observer Test

#### a. Who is the "Ordinary Observer"?

██ Having construed the patents' claims, the Court now considers whether the overall visual similarity between the AA Trigger and the patented designs would likely deceive an ordinary observer. As an initial matter, the parties differ as to the ordinary observer's identity. Arminak argues that the ordinary observer is a buyer for an industrial purchaser or contract filler, because only such buyers purchase trigger sprayers directly. Calmar counters that retail consumers are the "ordinary observer" because they purchase the end products that incorporate the shrouds.

The focus of the "ordinary observer" test "is on the actual product that is presented for purchase, and the ordinary purchaser of that product." *Goodyear*, 162 F.3d at 1117. "[T]he ordinary observer is not any observer but one who, with less than the trained faculties of the expert, is 'a purchaser of things of similar design,' or 'one interested in the subject.'" *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 430 (6th Cir.1933). Such an observer is not a person who has never seen the type of item the patent describes, "but one who, though not an expert, has reasonable familiarity with such objects, and is capable of forming a reasonable judgment when confronted with a design therefor as to whether it presents to his eye distinctiveness from or similarity with those which have preceded it." *Id.* See also *Goodyear*, 162 F.3d at 1116 ("[D]eception concerning the patented design is determined from the viewpoint of the person who is the ordinary purchaser

of the article charged to be an infringement.")

The question is whether, where a patented article is only sold to consumers as incorporated into a larger product, the "ordinary observer" is the consumer or the upstream purchaser of the patented item. The Federal Circuit addressed a similar issue in *KeyStone*, which involved a design patent for blocks used in retaining walls. *KeyStone Retaining Wall Systems, Inc. v. Westrock*, Inc., 997 F.2d 1444, 27 U.S.P.Q.2d 1297 (Fed.Cir.1993). After the district court granted the defendant's motion for partial summary judgment on the issue of noninfringement, the patentee appealed. On appeal, the patentee argued that the district court had improperly failed to credit evidence that visitors to trade shows were confused between the patentee's blocks and the accused blocks. *Id.* at 1451. The Federal Circuit disagreed, stating that the patentee's evidence improperly focused on the blocks as incorporated into a larger product:

> Even crediting [the patentee's] evidence, it did not create a genuine issue for trial on the issue of overall similarity of the accused design with the patented block design because it primarily related to the unpatented wall, not the blocks. Although the blocks when aligned in a retaining wall may create a similar wall appearance, *the patented design is of an individual block, not an assembled wall, and the 'ordinary observer' for the purpose of the block design patent is a purchaser of the patented block, not of the unpatented wall.*

*KeyStone*, 997 F.2d at 1451, 27 U.S.P.Q.2d at 1302 (emphasis added.)

In *Goodyear*, 162 F.3d at 1113, the Federal Circuit addressed a design patent for a tire tread design used on truck tires. *Goodyear*, 162 F.3d at 1115. Following

the district court's determination of noninfringement, the patentee appealed. *Id.* On appeal, it argued that the district court had erred in its claim construction by construing the word "tire" in the patent's claim language, "the ornamental design for a tire tread," to mean "truck tire." *Id.* at 1116. The patentee further argued that the district court had erred by taking the "ordinary observer" to be a purchaser of truck tires, when the patent was not so limited. *Id.* at 1117. Although the Federal Circuit agreed that the patent was not limited to truck tires, it held that the "ordinary observer" was a trucker or truck fleet operator, because "both the accused tire and the [patentee's] commercial embodiment are truck tires." *Id.* at 1117. The Federal Circuit held that the focus must be on the "actual use of the accused infringing tread," the "actual product that is presented for purchase, and the ordinary purchaser of that product." *Id.* It based this holding on the fact that "the standard [annunciated in *Gorham*] is whether ... a purchaser [of the patented] item would be mislead, by the design similarity imparted to the article by the copier, to think that it is the patentee's design that is being purchased." *Id.*

That the "ordinary observer" is the purchaser in danger of being misled was confirmed in *Puritan–Bennett Corp. v. Penox Technologies Inc.*, 2004 WL 866618 (S.D.Ind., March 2, 2004). That case presented the issue whether, when a product is purchased by institutional entities for use by individuals, the ordinary observer is the institutional entity or the end user. The patentee, Puritan–Bennett, sued for infringement of its design patent for portable liquid oxygen tanks. *Id.* at *23. Patients could only obtain the tanks by prescription, and typically rented them from equipment dealers, medical suppliers, or hospitals. *Id.* at *7. The court granted summary judgment for the defendant, holding that there was no infringement as a matter of law because the overall visual impression of the accused device was dramatically different than that of the patented design. *Id.* at *24–27. The court reached its holding despite Puritan–Bennett's presentation of a survey of hospital patients who used the oxygen tanks, which purported to show consumer confusion. *Id.* at *26. The court stated that the study failed to present a genuine issue of material fact because the surveyed patients did not represent the "ordinary observer." *Id.* The ordinary observer, the court held, was a medical equipment distributor and not a patient, because it was the distributors who actually purchased the oxygen tanks. *Id.* The court declined to hold that patients were the ordinary observers, despite the fact that the patentee presented substantial evidence that it marketed its products directly to patients and that its marketing created substantial interest and demand from those patients.[2] *Id.* at *8–10.

To similar effect is *Spotless Enterprises, Inc. v. A & E Products Group, L.P.*, 294 F.Supp.2d 322 (E.D.N.Y.2003), which involved a design patent for lingerie han-

---

**2.** For example, the patentee "promoted [the commercial embodiment of the patented design] through a national television advertising campaign ... [including] an 800 number for persons to call to obtain more information concerning [its] product ..." *Id.* at *10. Since the introduction of the television commercial campaign, [the patentee had] received close to 50,000 telephone calls from persons seeking information about [the prod-

uct]. *Id.* The patentee also presented evidence that it sent product brochures, kits, and other information to patients, launched promotional activities directed towards patients, used newspaper advertisements to promote the products to patients, and generally attempted to create "pull-through" sales of its product by creating demand among end users. *Id.* at *7–11.

gers. Garment manufacturers purchased the hangers from the hanger manufacturer, and then resold them with the garments to stores such as Wal–Mart, Target, and Mervyns. *Spotless Enterprises*, 294 F.Supp.2d at 329. The court held the "ordinary observer" to be "not the general public, but the sophisticated buyer for the garment manufacturer." *Id.* at 347.[3]

In light of the above cases, "ordinary observers," of sprayer shrouds must be buyers for companies that purchase trigger sprayers. It is undisputed that those buyers are the only people who buy trigger sprayers that are not already incorporated into a bottled product. Calmar's Vice President of Sales, Anthony Mirocke, testified in his deposition that Calmar had never sold a single item to a consumer directly. (Mirocke Depo., 210:18–25.) Ed Rodden, a former Calmar customer service manager, stated that it was "accurate" to say that "Calmar's customers are not consumers." (Rodden Depo., 39:8–11, Exh. 24 to Lee Decl.) Although an end user necessarily obtains the shrouds when she buys the complete household product, she is not the "ordinary observer" because she purchases a product into which the patented item is incorporated. *KeyStone*, 997 F.2d at 1451 ("the 'ordinary observer' for the purpose of the block design patent is a purchaser of the patented block, not of the unpatented wall.") *See also Spotless Enterprises*, 294 F.Supp.2d 322 (purchaser was buyer of hangers, not consumer of lingerie sold on the hangers).

Calmar argues that consumers must be the ordinary observers because consumers notice differences among different types of triggers sprayers and the sprayer design affects the user's physical comfort while using the product. Calmar points to deposition testimony of Mr. Mirocke, who stated that a customer may abandon a particular product if the sprayer trigger doesn't work:

> [Y]ou know, if [the consumers] see a difference on the sprayer, the first thing that's going to enter their mind is, what else did they do to change the formula? Did they cheapen it up? You know, if they've changed the sprayer, if they take the sprayer home and it doesn't work just like the one they've been using, the first thing they think of is what did they do to the juice in the bottle. I mean, we've even had them—one of them, I believe it was one we did in the UK, the lady came out and said, Don't change the sprayer. They know the look, they know that's the sprayer that's supposed to be on that bottle.

(Mirocke Depo., 122:20–123:9.) Calmar also points to testimony by Ronald Wadsworth, designer of the ERGO shroud, who stated in his deposition that the design of the sprayer shroud affects the ease and comfort of use of household products, (Wadsworth Depo., 50:25–52:1, 123:15–19, Exh. 7 to Lee Decl.), and testimony of Ronald B. Fernandez, Calmar's former product manager, who stated that consumers look for "reliability, durability, ease of function, nonleading, [and] aesthetic appeal" in trigger sprayers. (Fernandez Depo., 74:5–10, Exh. 25 to Lee Decl.)

The fact that consumers notice differences in quality between different spray-

---

**3.** Calmar attempts to distinguish *Spotless Enterprises* on the ground that the consumers in that case did not purchase the hangers, whereas buyers of household products purchase the trigger sprayers as part of the product. However, consumers ordinarily do obtain hangers as part of garments they purchase. Moreover, the court in *Spotless Enterprises* did not indicate that it based its holding on a finding that consumers did not purchase the hangers, and gave no indication that the ordinary observer would have been different if they did purchase them.

ers, and may have preferences among various types of sprayers, does not establish that they are the "ordinary observer" of sprayer shrouds. The product they purchase is not a trigger sprayer or shroud, but an entire bottle of cleaning solution. *See KeyStone*, 997 F.2d at 1451 (ordinary observer is purchaser of patented block, not unpatented wall incorporating the block.) As in *Puritan–Bennett*, consumer preferences and even direct marketing to consumers do not convert those consumers into "ordinary observers." Indeed, there is much less evidence of marketing to the end consumer in this case than there was in *Puritan–Bennett*, where the court held that consumers were not ordinary observers despite evidence that some consumers actually called the manufacturer seeking information about the tanks.[4]

Calmar cites *Gorham* for the principle that the "ordinary observer" cannot be an expert, because if experts were the ordinary observer there could never be design patent infringement. It points out that the *Gorham* court criticized the district court's reference to experts as the ordinary observer, stating that "[s]uch a test would destroy all the protection which the act of Congress intended to give. There could never be piracy of a patented design, for human ingenuity has never yet produced a design, in all its details, exactly like another, so like, that an expert could not distinguish them." *Gorham*, 81 U.S. at 527, 14 Wall. 511. This argument fails for several reasons. First, Calmar itself argues that purchasers of trigger sprayers do not necessarily qualify as "experts" on

trigger shroud design. Several Calmar employees testified that the companies that buy trigger sprayers range from large, sophisticated entities to relatively unsophisticated operations for whom price is the primary consideration. (*See, e.g.,* Rodden Depo., 40:7–13, Exh. 25 to Lee Decl.) Mr. Rodden, for example, testified that "Calmar had a very broad range of customers, ranging from people that mixed products in bathtubs and bought 5,000 sprayers a year to multinationals like [Proctor & Gamble], who made or . . . broke the company, depending on what they bought." (*Id.*) Mr. Rodden also stated that "there is a small segment of the market that is not sophisticated." (*Id.* at 206:24–207:1.)

Even assuming that trigger sprayer buyers are "experts," however, they still are the proper "ordinary observers" in this case. *Gorham's* statement that experts should not be the ordinary observer where they are not the buyers of the relevant product does not preclude sophisticated buyers from being the ordinary observer where they are the only ones who purchase the patented product directly.[5] The reason *Gorham* cautioned against using experts as ordinary observers in most cases was that experts in most cases are *not* purchasers of the relevant items: "*It is [ordinary consumers] who are the principal purchasers* of the articles to which designs have given novel appearances, and if they are misled, and induced to purchase what is not the article they supposed it to be . . . the patentees are injured." *Gor-*

---

4. Although Calmar argues that consumers are the "end user," (Dehoff Decl., ¶ 4) the "end user" test was rejected in *Puritan–Bennett*, in which the patients, though "end users" of the oxygen tanks, were held not to be the ordinary observer.

5. Indeed, courts have so held. *See, e.g., Spotless Enterprises, Inc. v. A & E Products Group L.P.*, 294 F.Supp.2d 322 (E.D.N.Y.2003) ("The ordinary observer in this case is not the general public, but the sophisticated buyer for the garment manufacturer, who purchases the hangers."); *Puritan–Bennett*, 2004 WL 866618.

*ham,* 81 U.S. at 528, 14 Wall. 511.[6] Thus, *Gorham* counsels that the likelihood of deception must be judged by reference to the people who actually purchase the patented article, and who could be misled by excessive similarity.

Consumers' purchasing decisions are unlikely to hinge on the appearance of sprayer shrouds. Calmar's own evidence shows that consumers base their decisions on other factors, such as the brand and product characteristics. A survey of female users of cleaning products, submitted by Calmar, concludes that "very few women consciously took into consideration the design/shape of the bottle prior to purchasing the product." (Exh. 16 to Lee Decl., at 226.) The survey quotes participants as saying, about the bottle design, "[i]t doesn't make a bit of difference to me," and cites participants' "indifference to container design." (*Id.*) The survey stated that women were "most concerned with a product's efficacy, breadth of use and/or price. The bottle's design and trigger

seemed of lesser interest...." (*Id.* at 216.)[7]

Another survey Calmar presents, entitled "Impact of Trigger Sprayers on Brand Value," is not to the contrary. The survey is presented in video format, and shows a questioner sitting at tables with women who use household cleaning products. The women say that they would switch to a different brand of cleaner if the trigger sprayer on one brand of product didn't work, and that trigger sprayer failures cause them to think less of the product dispensed through the malfunctioning sprayer. However, none of the women in the survey said that they would consider the appearance of the sprayer shroud in deciding what product to switch to after encountering a sprayer malfunction. Nor did any of them say that they would be deterred from buying a different product if its sprayer shroud appeared similar to a sprayer shroud they recognized from a malfunctioning product. The only conclu-

---

6. Indeed, the patented design in *Gorham* was used on retail items, spoons and forks, primarily purchased by consumers.

7. Under a section entitled "How Products Evaluated/Selected," the survey stated that "[w]omen evaluated spray glass cleaners and multi-purpose cleaners primarily in terms of their efficacy." (*Id.* at 220.) The survey concluded that the primary factors considered by buyers of household products were efficacy, breadth of use, familiarity with the product, price, and "container." (*Id.* at 220). As to the last factor, the survey commented "[t]he majority of women liked bottles that were clear or only slightly opaque, as these allowed the user to know how much of the product was left." (*Id.*) Although Calmar presents another document, a "slide presentation," purporting to represent survey findings on the effect of trigger sprayers on brand value, (Exh. 18 to Lee Decl.) and purporting to conclude that consumers consider trigger sprayer quality an important part of the brand, that study lacks any explanation of its methodology and consequently is not supported by an

adequate foundation. In any event, even that study concluded that consumers consider factors unrelated to the appearance of the trigger sprayer, such as "functionality, integrity, durability, and ergonomics," in addition to "aesthetics," when deciding whether to buy. (Exh. 18 to Lee Decl., p. 229.) The only evidence Calmar presents that even suggests consumers consider the shroud when making a purchase is unsubstantiated and improper opinion testimony from its President and CEO, John McKernan, that consumers purchase products primarily based on the appearance of the shroud, and statements from its expert, Stephen Dehoff. (McKernan Depo., 80:18–81:4, Exh. 23 to Lee Decl.; Dehoff Decl., ¶¶ 12–23, Exh. 45 to Lee Decl.) Mr. Dehoff testifies that consumers are highly influenced in their purchases by products' overall "shape." (*Id.,* ¶¶ 12–23.) However, Mr. Dehoff's testimony is insufficient to show that purchasers make their purchasing decisions based on shrouds, because he presents no evidence that the shape of shroud in particular is a significant factor, apart from the shape of the overall product.

sion they drew from the poor quality sprayer was that the product itself was faulty; there was no evidence they noticed or made purchasing decisions based on how the shroud looked.

In short, consumers are not at risk of being confused into buying the wrong product by visual similarities between sprayer shrouds. The only people likely to base their purchasing decisions to a significant degree on the shrouds' appearance, or to experience confusion if shrouds are overly similar, are buyers of trigger sprayers. To effectuate *Gorham's* purpose of preventing purchasing decisions based on confusion, it is those buyers who must be taken as the ordinary observer.[8]

Calmar also cites *Contessa* for the proposition that the "ordinary observer" includes all people who will purchase the product throughout its lifetime, including consumers. (Opposition, p. 7.) Calmar is incorrect. *Contessa* referred to the lifespan of a product in annunciating the correct standard for determining *whether deception is likely*, not in annunciating the test for the ordinary observer. The Federal Circuit held the district court had erred in failing to consider all views of the patented design that the purchaser was

likely to see over the product's lifespan.[9] *Contessa,* 282 F.3d at 1379, 62 U.S.P.Q.2d at 1069. The Federal Circuit did not state that the product's entire lifespan must be considered to determine *who purchases* the patented item.

For the foregoing reasons, the Court concludes that the ordinary observer of trigger sprayer shrouds is the purchaser of trigger sprayers.

**b. Would the Ordinary Purchaser of Trigger Sprayer Shrouds be Deceived by the Similarities Between the AA Trigger and the Patented Designs?**

▉ Calmar's own evidence indicates that buyers for companies that purchase sprayer shrouds are not deceived by the similarities between the AA Trigger and the patented designs. A former Calmar customer service manager, Ed Rodden, testified that most of Calmar's customers "wouldn't be fooled for a second." (Rodden Depo., 39:23–40:5, 206:17–23, 207:2–5.) Calmar's expert, Stephen Dehoff, testified that "[i]t would be a significant exception for a corporate buyer purchasing the Arminak trigger sprayer to confuse the Calmar Ergo Shroud and the Arminak AA

---

8. Calmar argues that, under *Goodyear,* the ordinary observer is the purchaser of the item into which the patented design is incorporated, because the truckers and fleet operators in *Goodyear* purchased tires that incorporated the patented tread. (Opposition, p. 11.); *Goodyear,* 162 F.3d at 1117. Like purchasers of tires that incorporate tread, Calmar argues, consumers purchase household products that incorporate sprayer shrouds. Calmar's analogy is inapposite, however, because the focus of the *Gorham* test must be on the purchaser who is at risk of being confused and making the wrong purchase. Whereas a purchaser of truck tires is likely to consider the tread one of the main attributes of the tire, and thus to base his purchasing decision on the tread's appearance, a purchaser of a bottle of cleaning fluid is unlikely to consider the appearance of the sprayer shroud as a major factor

in the purchasing decision, as Calmar's own evidence shows. Thus, a more apt analogy to the purchaser of tires incorporating patented tread is a buyer of trigger *sprayers* incorporating a patented shroud.

9. Specifically, the district court failed to consider the appearance of the underside of the patented shrimp tray, because the underside was "at least partially obscured in the accused product at the point of sale." *Id.* at 1379. The Federal Circuit held that was error because the ordinary observer test must consider "all ornamental features visible during normal use of the product, *i.e.* beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of the article." *Id.* at 1380.

shroud," and that "[t]here is essentially no question that a corporate buyer purchasing these trigger sprayers with these specific shrouds would be able to tell the difference easily." (Dehoff Decl., ¶¶ 3(2), 5.) The only qualification to these statements is a statement by Mr. Rodden that some of Calmar's smaller customers, whose primarily consideration is price, are "not sophisticated and potentially could be fooled." (*Id.* at 206:24–207:2.) However, Calmar's Vice President of Sales, Anthony Mirocke, admits that he is not aware of any of Calmar's customers having expressed confusion between the AA Trigger and the ERGO shroud. (Mirocke Depo., 218:21–219:11.) The only other evidence Calmar presents supporting potential confusion by its customers is a statement by Mr. Mirocke that "Some of my customers would recognize [the difference] in a second. Others would not." (Mirocke Depo., 121:15–19). The ones who would not, Mr. Mirocke testified, were "[t]he B and C customers, someone buying for Dollar General." (*Id.* at 18–19.) [10] However, testimony that some consumers might not immediately recognize the difference is insufficient to create a triable issue of fact as to whether the ordinary buyer of trigger sprayers is likely to be deceived.

Even apart from Calmar's admission that most of its customers would not be deceived, the Court's independent comparison of the patented designs and the AA shroud convinces it that no reasonable buyer of trigger sprayers would confuse them. Calmar urges the Court to focus only on the side views of the accused product and the designs, because shoppers in a supermarket are most likely to view the products from the side, standing a substantial distance away, and are unlikely to look at the triggers from the front or bottom. Calmar also urges the Court to disregard aspects of the AA Trigger and patented designs that do not appropriate the "points of novelty" that Calmar asserts. Arminak counters that all views claimed in the patent are relevant, and that the Court should focus on all aspects of the design and accused article rather than simply the asserted points of novelty.

The Court's comparison takes into consideration all the views included in the design patents, not simply those views that a customer would likely see when viewing cleaning products on a store shelf at the point of sale. *Contessa,* 282 F.3d at 1379 (district court erred in considering only the views of the patented shrimp tray design that a consumer likely would see at the point of sale.) Also, at this stage the Court declines to consider only the asserted points of novelty in the patented designs, because the "point of novelty" test is separate from the ordinary observer inquiry. *Bernhardt,* 386 F.3d at 1383. Indeed, there is no need even to consider the point of novelty test if the overall visual impression of the two articles is dissimilar. *KeyStone,* 997 F.2d at 1451.

10. Calmar also presents deposition testimony by Odie Cernonok, a salesman for Arminak, who testified while viewing an array of unspecified trigger sprayers made by "different manufacturers." When asked "Do they all look the same?" he replied "Pretty much." (Cernonok Depo., 84:2–5, Lee Decl., Exh. 38.) This evidence is irrelevant, however, because there is no indication which triggers are shown in the display or even whether the similarities between them are sufficient to cause Mr. Cernonok to be deceived. Moreover, Mr. Cernonok is a salesman and not a buyer of triggers, and thus not an "ordinary observer."

Calmar also presents evidence that Arminak's expert, Daniel Cislo, confused an example of a trigger sprayer called the Y2–8 Trigger, which Calmar considers is almost identical to the AA Trigger, with the ERGO Shroud in a deposition. (Opposition, p. 14; Lee Decl., Exh. 31.) However, this evidence also is irrelevant, as Mr. Cislo is a lawyer, not a buyer of trigger sprayers.

Based on all the figures disclosed in the '581 and '602 Patents, striking differences between the AA Trigger and the patented designs create an overall visual impression of dissimilarity. On a side view, one is struck by the fact that the AA Trigger, but not the patented designs, has an upwardly-slanting line running from the base of the shroud to the horizontal line, and a raised surface defined by the intersection of that slanted line and the horizontal one. By contrast, the patented designs show no change in elevation on the portions of the trigger sides below the horizontal line. This difference creates a significantly different visual impression: a constant, smooth surface in the patented designs, versus a varied surface in the accused shroud. Further dissimilarity appears on the back view: the patented designs slope downward in a rounded, convex, and consistent manner below the level of the horizontal side line, while the AA Trigger has straight edges below the line and a flared shape that first extends outward and then tapers in again before reaching the bottom of the shroud. (*See* Exh. 8 to Lee Decl., Photographs of AA Shroud compared to figures in '581 and '602 Patents.) The front of the AA Trigger is similarly angular and flared, in contrast to the ERGO shroud's rounded sides.[11] Taking a top view, the patented designs show sides generally parallel to the topmost rectangular surface so that the overall shape is roughly rectangular. The AA Trigger, by contrast, has sides that flare outward from the back of the shroud to the middle, flatten out for a short distance, and then converge towards the front, to give an approximately diamond-shaped appearance. The same difference in shape appears when the designs are examined from the bottom. The overall differences in shape and surface elevation create a striking degree of dissimilarity between the patented designs and the accused device, such that no reasonable jury could find that an ordinary purchaser of trigger sprayers would be deceived.

The only similarities between the AA Trigger and patented designs are the general outline of the side view and the existence of a horizontal line running from front to back. However, the similarity of side outline is no greater than that between the patented designs and similar outlines disclosed in U.S. Patent Des. No. 321,315, (the "'315 Patent"), cited as a prior art reference by Calmar, and No. 5,156,299 (the "'299 Patent"), issued on October 20, 1992. (Exh. 41 to Lee Decl., Tab 45; Exh. L to DeCarlo Decl. *See also* Exh. 33 to Lee Decl. (comparing figures in '581 Patent to figures in '315 Patent)). Thus, "while there is some similarity between the patented and alleged infringing designs, which without consideration of the prior art might seem important, yet such similarity as is due to common external configuration is no greater, if as great, between the patented and challenged designs as between the former and the designs of the prior art." *Applied Arts*, 67 F.2d at 430. Moreover, the rough similarity of side outline cannot overcome the AA Trigger's distinguishing upwardly-sloping diagonal line and varied surface elevation,

---

**11.** In making its comparison, the Court considered both the designs in the '581 and '602 Patents and actual samples of the ERGO shroud submitted by Arminak. The Court considers the commercial embodiment of the '581 Patent because it does not differ significantly from the drawings in the patent. *See Braun, Inc. v. Dynamics Corp. of America,* 975 F.2d 815, 820 n. 8. 975 F.2d 815, 24 U.SP.Q.2d 1121 (Fed.Cir.1992) (*quoting Lee v. Dayton–Hudson Corp.,* 838 F.2d 1186, 1189 (Fed.Cir.1988)) ("Where, as here, no significant distinction in design has been shown between the patent drawing and its physical embodiment, it is not error for the court to view them both, and to compare the embodiment of the patented design with the accused devices.")

which are absent from the patented designs, and the numerous differences in overall shape that appear from the top, bottom, front, and back views.

### 3. Point of Novelty

 Even if an ordinary observer could be deceived by the similarities between the accused shroud and the patented designs, whatever similarities exist do not stem from the points of novelty claimed in the '581 and '602 Patents. Calmar contends that those points of novelty are:

- There is a prominent horizontal line extending along each side [of the shroud], parallel to the top surface of the shroud, all the way to the sloped rear surface; and

- The sides of the shroud first go straight downwardly, and then, as viewed from the rear, at the horizontal lines on each side, bulge outwardly in a bulbous fashion, to the bottom rear of the shroud.

(Opposition, p. 16 n. 68 (referring to Exh. 12 to Lee Decl.); Exh. 12 to Lee Decl., at 157.)

Arminak argues that neither of Calmar's asserted points of novelty are in fact novel, because both are disclosed in what Arminak characterizes as a prior art reference: U.S. Patent No. 327,222 (the "'222 Patent"), issued on June 23, 1992. (Exh. 1 to Lee Decl.)[12] Having viewed the '581 and '602 Patents' file histories, the examples of prior art submitted by Calmar, and Calmar's description of its asserted points of novelty, the Court concurs with Calmar's characterization of the points of novelty in the '581 and '602 Patents.

Those points of novelty, however, do not create an overall impression of similarity. The AA Trigger's sides do not "bulge outwardly in a bulbous fashion," but instead flare out in straight lines before converging slightly inward towards the bottom of the shroud.[13] While the "bulbous" portion of the patented designs begins approximately halfway down the back of the shroud, the flare in the AA Trigger occurs more than halfway down. Overall, the AA Trigger and the patented designs are significantly dissimilar when viewed from the back.[14] The only similarity is in the shrouds' general outline when viewed from the side, and the horizontal line running along the side from the nozzle to the rear edge. Although the line is a point of novelty, it is insufficient to lead to an overall

---

**12.** Calmar disputes that the '222 Patent is part of the prior art.

**13.** Calmar asserts, through the declaration of John McNulty, that the AA Trigger has convex sides. (McNulty Decl., ¶ 18.) Mr. McNulty bases his assertion on a patent application Arminak filed for the AA Trigger, No. 29/202,-909, which the PTO rejected, and claims that the application's drawings show that the AA Trigger has convex sides, because the patent examiner drew convex lines next to one of the drawings. (Id.) However, the application does not show that the AA Trigger has convex sides. The reason the PTO rejected the application was that the front and back images of the AA Trigger in the application were incompatible and not mirror images. (Exh. 2 to Lee Decl., at 60, 65.) The drawing that showed the AA Trigger from the front showed flat sides, whereas the drawing from the back showed convex sides. (Id. at 65.) The samples of the AA Trigger submitted by Arminak, and the photographs of the AA Trigger that Calmar submitted as Exhibits 8 and 35 to the Lee Declaration, show that the actual article has flat, not convex, sides. (See Exhs. 8, 35 to Lee Decl.)

**14.** The '222 Patent's drawings confirm that the AA Trigger does not contain the "bulbous sides" point of novelty Calmar claims. The AA Trigger's flared appearance, when viewed from the back, is similar to the back view disclosed in the '222 Patent. The '222 patent contains a drawing of a trigger sprayer viewed from the back, with sides that first extend almost vertically downward, and then angle out more sharply before becoming verti-

impression of similarity, especially since the line on the AA Trigger is intersected by a slanted line defining a raised surface. Consequently, the Court concludes that the "point of novelty" test would not be met even if overall visual similarity did exist.

### III. Conclusion

For the foregoing reasons, Arminak's motion for partial summary judgment on the issue of noninfringement is GRANT-ED.

cal lines near the bottom of the shroud. While the Court does not find that the '222 Patent contains the "bulbous sides" point of novelty claimed in the '581 or '602 Patents, the '222 Patent and others contained in the prior art submitted by Calmar establish that the field of trigger sprayers is crowded and therefore the "range of equivalents" to the '581 and '602 Patents should be construed narrowly. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444, 221 U.S.P.Q. 97 (Fed.Cir.1984) (*overruled in part on other grounds in Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)) ("Where ... a field is crowded with many references relating to the design of the same type of appliance, we must construe the range of equivalents very narrowly."). This is especially so because the prior art, though not teaching the precise points of novelty disclosed in the '581 and '602 Patents, contains several references disclosing horizontal lines running along the side of the shroud (Exh. 41 to Lee Decl., Tabs 8, 23, 26, 29, 36) and back portions that widen from top to bottom (Exh. 41 to Lee Decl., Tabs 1, 5, 6, 31). Indeed, any similarity that might appear between the back portion of the AA Trigger and the back drawings of the patented designs is no greater than the similarity between the back views claimed in the patented designs and the back view shown in the '222 Patent. *See Applied Arts*, 67 F.2d at 430.